603 A.2d 901

**Daniel Timothy BRASHEAR**

v.

**STATE of Maryland.**

**No. 597, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

April 2, 1992.

Revised and Refiled June, 1, 1992.

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Mary O'Malley Lunden, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before MOYLAN, GARRITY and CATHELL, JJ.

GARRITY, Judge.

Daniel Timothy Brashear, the appellant, was convicted by a jury (Casula, J., presiding) in the Circuit Court for Prince George's County of second-degree murder. A thirty-year prison sentence, the maximum allowed by law, was imposed. On appeal, appellant charges that the trial judge erred in the following ways:

1. He refused to remove a racial epithet from a tape recording which was admitted into evidence;
2. He refused to strike the jury on the theory that the State had used its peremptory challenges in a racially discriminatory manner;
3. He refused to suppress from the evidence a kitchen knife and letter written by the homicide victim;
4. He refused to suppress from the evidence a statement appellant gave the police;
5. He refused to suppress from the evidence a crumpled letter appellant wrote while he was alone in the interrogation room; and
6. He did not state on the record his reasons for imposing the sentence of thirty years.

In addition to these alleged errors committed by the trial judge, appellant also charges that the evidence was insuffi-

cient. We discern no defect in the trial and shall affirm the judgment.

### FACTS

Around 10:00 p.m. on October 17, 1990, Prince George's County police officer, Corporal Charles Smith was on motor patrol in the Temple Hills area of the county. As he passed 4424 Beech Road, he observed a woman lying on the ground next to a pay telephone as the appellant was standing nearby holding a baby. Upon determining that the woman, Lisa Lindsey, was unconscious, Corporal Smith had her transported to the hospital. Unfortunately, Ms. Lindsey died the next day. The medical examiner opined that she had died from two blows to her head.

After making a quick examination of Ms. Lindsey, Corporal Smith asked the appellant to explain what had happened. The appellant answered that he had struck Ms. Lindsey, his common law wife, in the course of a domestic argument. Later, in a written statement, the appellant explained that he had struck Ms. Lindsey because she had provoked him by abusing him and their two-month-old son.

Other officers, including Detective Dischinger, arrived at the scene and appellant was placed under arrest. Before he was taken to the police station, however, he was allowed to visit his nearby apartment. He went into his apartment accompanied by Detective Dischinger to procure supplies for the baby. During their short visit in the apartment, the appellant showed the detective a kitchen knife which he said Ms. Lindsey had used when she had attacked him. The next day another police officer, Officer Bruciak, returned to the apartment and recovered the knife and a letter which Ms. Lindsey had written.

Although the appellant elected not to testify or call any witnesses at trial, he introduced several exhibits.

### *Admission of Tape*

■ At the time the appellant was apprehended on the street he gave Corporal Smith a tape recording. He explained to the Corporal that, when he was speaking with Ms. Lindsey, he was wearing a voice activated tape recorder and recorded the conversation he had had with her immediately before he struck her. Corporal Smith took the tape which was ultimately offered as evidence at the trial.

The defense was pleased to have the tape admitted into evidence but wanted portions of it redacted. The portions appellant wanted redacted consisted of phrases in which he made racial epithets uncomplimentary to African–Americans.

At a pretrial suppression hearing, defense counsel recited to the court a segment of the tape recording he wanted redacted. We produce here the full segment recited by counsel with the phrases which he requested to be redacted underlined.

Get your fucking ass out of my fucking life and leave me the fuck alone. I am fucking tired of you, and <u>your fucking goddamn nigger kid</u>. I'm tired—she says, Lisa Lindsey says I'm tired of your shit. You don't care nothing about me. The Defendant says I'm tired of your phony police reports, and <u>your nigger fucking kid</u>. Get the fuck out. All you have to do is fucking leave to begin with. (emphasis added)

Counsel explained that both the appellant and Ms. Lindsey were white, but that Ms. Lindsey had another child by an African–American. The offensive comments were made in reference to that child.[1] Counsel then argued that the emphasized portions of the remarks were racist epithets which would be offensive to a "sophisticated black person." Counsel noted that since Prince George's County has an African–American population of slightly over fifty percent, he expected a significant number of that group would be on the jury and form a prejudice against appellant because of the remarks.

The trial judge refused to order the redaction and explained his ruling:

THE COURT: As I said before, Mr. Niland, I thought the tape was relevant and I think it was made contemporaneously with the incident that is being presented here today. I feel that every inch, every word of it that was said was relevant.

I tell you why. I see in that the beginning of a highly, high-pitched emotional argument, which escalated into where we have mortal wounding of the deceased. I think it is all relevant.

However, if there is a part here—I have listened very intensely and intently. I weighted the prejudice that could come from the racial epithets that were used, but I think the probative far outweighs the prejudice. I think what you have to do is, and I think will help eliminate a lot of that by appropriately framing questions that we can ask the jurors.

We are now asked to decide whether the trial judge committed reversible error when he refused to order the redaction.

---

**1.** The appellant characterized the victim as his common law wife, who was the mother of their two-month-old son. He explained, in a statement that he gave to the police, that the argument erupted when she threatened to change the name of his son and put him up for adoption because she hated the infant as much as she thought the appellant despised her son, who was "half black, half white."

In order to answer this question, we have to consider two subquestions: Were the objectionable phrases relevant? Assuming the phrases were relevant, did their probative value outweigh their prejudicial effect? *Bedford v. State,* 317 Md. 659, 668, 566 A.2d 111 (1989) and *Jackson v. State,* 87 Md.App. 475, 485, 590 A.2d 177 (1991).

A fact is relevant if it "tends to establish or disprove a material fact." *Campbell v. State,* 65 Md.App. 498, 508, 501 A.2d 111 (1985), *cert. denied,* 305 Md. 599, 505 A.2d 856 (1986). "Evidence is material if it tends to establish a proposition that has legal significance to the litigation." *Paige v. Manuzak,* 57 Md.App. 621, 632, 471 A.2d 758, *cert. denied,* 300 Md. 154, 476 A.2d 722 (1984). The trial judge is vested with the discretion to decide whether an item of evidence is relevant. *Best v. State,* 79 Md. App. 241, 259, 556 A.2d 701 (1989). In this case, the trial judge concluded that the offensive phrases were relevant because they tended to show the existence of a "high-pitched emotional argument." This would tend to show appellant's state of mind, which, in turn, had a bearing on whether he possessed the requisite intent/lack of mitigating circumstances to commit the crime of first-degree murder. We concur with the trial judge's ruling that the evidence was relevant.

The second, and more difficult, question is whether the prejudicial effect of the evidence outweighed its probative value. The answer to that question involves the exercise of discretion by the trial judge. *Hunt v. State,* 312 Md. 494, 503–04, 540 A.2d 1125 (1988). In this case, the trial judge decided that the prejudicial effect could be removed by questioning the jurors. The jurors were questioned and none responded that the remarks would prejudice him. Under the circumstances, we lack a basis to find error.

### *Peremptory Challenges*

The question here is whether the jury was improperly composed because several white venirepersons were peremptorily struck from the jury. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

The facts may be simply stated. Appellant is white. The jury panel was approximately fifty percent white and fifty percent black. During the impaneling process, the prosecutor peremptorily challenged six white venirepersons and two black venirepersons. We must decide whether the prosecutor's challenge to the six white venirepersons amounted to illegal racial discrimination.

As observed by Judge Moylan in *Mejia v. State*, 90 Md.App. 31, 599 A.2d 1207 (1992) (wherein we held that a Hispanic defendant failed to make out a *prima facie* case of a *Batson* violation):

Although all of the reported appellate decisions in Maryland considering *Batson* claims have thus far involved peremptory challenges against blacks, the undergirding logic of Equal Protection law, on which *Batson* rests, compellingly requires that its strictures must also apply to peremptories used against any other cognizable group....

* * *

Successful challenges to the use of peremptories have, moreover, been maintained in a number of state courts and lower federal courts with respect to a smorgasbord of cognizable target groups. These have included such groups as whites, *Roman v. Alabama*, 822 F.2d 214, 227–228 (2d Cir.1987); ... *Gov. of Virgin Islands v. Forte*, 865 F.2d 59, 64 (3d Cir.1989); ...

*Id.* at 35.

In *Roman*, a white defendant, convicted of conspiracy to commit arson, alleged that he had been deprived of a fair trial because of the prosecutor's use of eight peremptory challenges to exclude white jurors. The Second Circuit held that a prosecutor's use of peremptory challenges to prevent whites from sitting on the jury on the basis of their race violated Roman's Sixth Amendment right to the possibility of a jury reflecting a fair cross section of the community. *Id.* at 227–228.

In *Forte*, a white male was convicted of having raped a black female. On appeal, the defendant contended that the government's exercise of its peremptory challenges to remove all white persons from the jury was plain error under *Batson*. In recognizing that Forte was a member of a cognizable racial group, the Court stated:

Defendants of both groups [white and black] are entitled to trial before juries from which members of their race are not excluded as the result of purposeful discrimination by the prosecutor. We cannot hold that a white defendant convicted by a jury selected in a racially discriminatory manner should be satisfied with the knowledge that it is usually blacks who are unfairly treated and therefore may be denied relief himself.... Thus, we now hold ... that *Batson* applied to both white and blacks...

*Id.* at 64.

When a *Batson* question arises, the trial judge is required to follow a three-step process. The Supreme Court outlined the process in *Hernandez v. New York*, 500 U.S. ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991), where the Court said:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. [*Batson v. Kentucky*] *Id.* [476 U.S.], at 96–97 [106 S.Ct., at 1722–1723]. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.*, at 97–98, 106 S.Ct., at 1723–1724. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.*, at 98, 106 S.Ct., at 1723.

If after applying this test, it is determined that even a single juror was excused for racial reasons, the jury panel will be considered to be defective. *Tolbert v. State,* 315 Md. 13, 19, 553 A.2d 228 (1989).

In this case, the trial judge ruled that the six excused venirepersons amounted to a *prima facie* showing that the peremptory challenges were made on the basis of race. (Step One) He, therefore, required the prosecutor to place on the record race neutral explanations for striking the six jurors. (Step Two) This was done and the following reasons were given:

| Veniremen | Reasons |
| --- | --- |
| One | Martial arts background. |
| Two | Uncle convicted of drug offense. |
| Three | Long hair, casual dress. Made eye contact with appellant in manner which suggested sympathy with appellant. |
| Four | Retired Air Force Officer. Had served on a court martial. |
| Five | Knew a State's witness. |
| Six | Minister who dealt with domestic issues. (Perceived to be sympathetic to appellant.) |

The term "race neutral reason" was defined by the Supreme Court in *Hernandez v. New York, supra,* at 500 U.S. ——, 111 S.Ct. 1866, to mean "an explanation based on something other than the race of the juror." The Court went on to explain that a prosecutor's reason must be accepted as race neutral "unless a discriminatory intent is inherent in the prosecutor's explanation."

The trial judge ruled that all of the prosecutor's reasons were race neutral, and on the basis of that finding ruled that the jury composition was proper. Appellant argues that the trial judge's ruling was wrong because the prosecutor's reasons were not "credible or convincing" but were mere "pretexts" made to cover the prosecutor's true racial motive.

As we explained in *Mejia v. State,* 90 Md.App. at 38, 599 A.2d at 1210, when an appellate court is required to review a trial judge's *Batson* ruling, the appellate court does not make a *de novo* fact finding or conduct an independent review, but defers to the trial judge's ruling. Thus, we reverse a trial judge's *Batson* ruling only if that ruling is clearly erroneous.

The record before us provides no basis for us to rule that the trial judge's conclusion that the prosecutor had race neutral reasons for all of his strikes was error. Accordingly, we conclude that the trial judge did not err in ruling that appellant had failed to carry his burden of proving purposeful discrimination. We hold that the jury panel was not defective.

### *Motion to Suppress Knife and Letter*

■ The appellant argues that the kitchen knife and letter recovered from his apartment should have been suppressed as evidence for the following reasons:

A. Detective Dischinger had no right to enter the apartment; and

B. Officer Bruciak had no right to enter the apartment.

Detective Allen Dischinger arrived at the scene shortly after Corporal Smith. Upon ascertaining what had happened, he decided to take appellant to the police station and informed the appellant of his plan. The baby that appellant was holding created a problem so the detective asked him whether he would like to go to his apartment and get some supplies for the baby. Appellant replied that he did, so the two men walked up to appellant's apartment. Appellant opened the door, and went inside. The detective followed without any objection being made by appellant. After they were in the apartment, appellant motioned to the detective to look at his desk where a kitchen knife was sitting. Appellant explained that the knife was the one Ms. Lindsey had attacked him with. He offered to pick-up the knife and give it to the detective, but Detective Dischinger told appellant to leave the knife where it was. Appellant procured the supplies for the baby and the two men left the apartment.

The next day, Officer Bruciak was sent to the apartment with instructions to retrieve the knife. By that time the police realized that the fight between appellant and Ms. Lindsey had begun in the apartment. The apartment was thus considered to be part of the crime scene. Consequently, no search warrant was procured. Officer Bruciak recovered the knife and a letter Ms. Lindsey had written.

### *Detective Dischinger*

Appellant argues that Officer Bruciak's seizure of the knife and letter was improper because Detective Dischinger had no right to enter the apartment. The trial judge found that appellant gave the detective consent to enter the apartment. He based this conclusion on his findings that: appellant was in custody when the two men went to the apartment; the appellant left the apartment door open, the detective followed appellant into the apartment, appellant

did not complain that the detective had entered the apartment; and the appellant pointed the knife out to the detective and offered to pick it up for him. Upon our own independent constitutional appraisal of these facts, we conclude that the detective had appellant's consent to enter the apartment. It follows from this that the detective's entrance into the apartment did not taint the subsequent seizure of the knife and letter. *See Matthews v. State*, 89 Md.App. 488, 496–97, 598 A.2d 813 (1991).

Furthermore, the detective's entry into the apartment was authorized under the Supreme Court's holding in *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982). In that case, a defendant was stopped because he was suspected of violating the law regarding alcoholic beverages. After he had been stopped, the defendant was allowed to return to his room to procure his identification, and the arresting officer followed him into the room. In upholding that action, the Supreme Court held: "The officer had a right to remain literally at [the defendant's] elbow at all times; nothing in the Fourth Amendment is to the contrary." *Id.* at 2, 102 S.Ct. at 814.

### Officer Bruciak

Alternatively, the appellant charges that the evidence should also have been suppressed because Officer Bruciak entered the apartment without a warrant.

This argument was not presented to the trial judge and was not considered by him.[2] The issue has therefore not been preserved for our review. Md. Rule 8–131(a).

### Appellant's Statement

■ The appellant argues that he made an oral statement to Corporal Smith at the time of his arrest and that the

---

2. At one point in his argument, counsel asked rhetorically, "What right did he have to be in there?" He did not make an issue of the matter, however, and the trial judge never considered whether Officer Bruciak had a right to enter the apartment.

statement should have been suppressed because it had been elicited without a proper *Miranda* [3] waiver.

The facts regarding this matter are as follows: When Corporal Smith first saw Ms. Lindsey and appellant, he approached and asked appellant what had happened. The appellant replied that his girlfriend had attacked him while he was trying to make a telephone call. He said he struck her back with the telephone receiver and she fell to the ground. The appellant concedes that this part of his statement was a blurt and, as such, did not require a *Miranda* warning/waiver. *See Ciriago v. State*, 57 Md.App. 563, 471 A.2d 320, *cert. denied*, 300 Md. 152, 476 A.2d 721 (1984). He goes on to argue that "all subsequent statements were inadmissible" because they had not been preceded with a *Miranda* warning.

The difficulty with this argument is that the appellant failed to identify the substance of the so called "subsequent statements." In fact, the corporal testified that after he made his initial "what happened" inquiry, he asked no further questions. Since the appellant has failed to show either that he gave an uncounseled statement or that such statement was admitted into the evidence, we have no basis to rule that any impropriety occurred. *McCree v. State*, 33 Md.App. 82, 98, 363 A.2d 647 (1976).

After the appellant was taken to the police station, he was given a *Miranda* warning and waived his *Miranda* rights. He then made some statements. He now argues that his initial post blurt statement to Corporal Smith tainted these later statements. Since the appellant has failed to show that he gave any post blurt statement, no basis exists for us to rule that the subsequent statements were tainted.

Moreover, the Supreme Court has ruled that "a suspect who has once responded to unwarned, yet uncoercive, ques-

---

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222 (1985). Thus, if the appellant did make an inadmissible statement to Corporal Smith, the statement, by virtue of the *Elstad* holding, did not taint the later statements given at the police station.

### *Motion to Suppress Crumpled Letter*

■ Shortly after the appellant had been taken into custody, Ms. Lindsey, who had been removed to the hospital, died, and a first-degree murder charge was filed against appellant. The police also decided to conduct further questioning. For this questioning, the appellant was taken to a small interrogation room. When the formal questioning was completed, the detective who conducted the interrogation, Detective Diane Ingham, left the room for some time. When she returned, she observed the appellant writing a letter. Upon seeing her enter the room, the appellant crumpled up the letter and tossed it on the table. The detective seized the letter. In the letter, the appellant stated that he had killed Ms. Lindsey. The letter was read to the jury by Detective Ingham.

The appellant argues that the seizure of the letter was illegal because he had an expectation of privacy in the letter and it was seized without a warrant. The trial judge ruled that the letter was properly seized because appellant had abandoned it.

The issue in dispute here is whether the trial judge was correct in ruling that the appellant had abandoned the letter. The appellant argues that he did not abandon the letter, but threw it away with the expectation that the police would not seize it. As support for this position, the appellant refers us to the Supreme Court decision in *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). In that case the Court said:

Since the decision in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), it has been the

law that "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). A subjective expectation of privacy is legitimate if it is " 'one that society is prepared to recognize as "reasonable," ' " *id*, at 143–144, n. 12, 99 S.Ct., at 430, n. 12, quoting *Katz, supra* [389 U.S.], at 361 [88 S.Ct., at 516] (Harlan, J., concurring).

*Id.,* 110 S.Ct. at 1687.

We concur with the trial judge's conclusion that a prisoner cannot have a legitimate expectation of privacy in a piece of paper he leaves behind in the interrogation room of a police station. To presume that a piece of paper left by a prisoner in an interrogation room would be carefully disposed of without the police examining it is ludicrous. *See Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (a prisoner in jail has no reasonable expectation of privacy in his prison cell.)

*Failure to State Reasons for Sentence On the Record*

■ The appellant charges that his thirty-year sentence should be vacated and that he should be re-sentenced. The reason he presents in support of this argument is that the trial judge, contrary to the dictates of Md. Rule 4–342(f), did not state on the record the reasons for the sentence imposed.

Md. Rule 4–342(f) provides that:

The court ordinarily shall state on the record its reasons for the sentence imposed.

At the sentencing hearing, the presentence report and victim impact statements were reviewed. Argument was presented and the appellant personally addressed the court. When all of this was completed, the trial judge announced the sentence, but he did not give any explanation why he imposed the sentence he did. Neither of the parties, how-

ever, objected to the omission. We are now asked to decide whether a re-sentencing is required because the trial judge did not state on the record his reasons for imposing the thirty-year sentence.

The rule does not require judges in all cases to give their reasons. All that the rule requires is that "ordinarily" a judge state his reasons on the record. The appellant candidly acknowledges that he did not object to the omission in this case. Under the circumstances, we hold that there was no reversible error.

### Sufficiency

The appellant argues that he should have been acquitted on the theory that he had acted in self-defense and he had not intended to inflict grievous bodily harm.

At the motion for judgment of acquittal, defense counsel argued that if the tape recording and appellant's statements were "enmeshed" one would find that there was no evidence that the appellant was the aggressor and hence the evidence was insufficient to prove second-degree murder. There was, however, evidence that Ms. Lindsey was struck twice in the head by the appellant. The jury decides what evidence is to be believed, what weight is to be given the various items of evidence, and what conclusions are to be drawn from the evidence presented. *Dykes v. State*, 319 Md. 206, 224, 571 A.2d 1251 (1990). The jury simply did not believe appellant acted in self-defense. No reason exists for us to rule that the jury's fact finding was in error.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.