676 A.2d 968

**Karen HUNTER**

v.

**STATE of Maryland.**

**No. 1122, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

May 29, 1996.

Constance A. Nathanson, Washington, DC (Stephen E. Harris, Public Defender and Shannon E. Avery, Assistant Public Defender, Baltimore, on the brief), for appellant.

Debra Dwyer, Special Assistant Attorney General (J. Joseph Curran, Jr. Attorney General, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., FISCHER and MURPHY, JJ.

WILNER, Chief Judge.

On an agreed statement of facts, appellant was convicted in the Circuit Court for Carroll County of having violated Md. Code Health Occupations art., § 8–701(a). That section states:

"Except as otherwise provided in this title, a person may not practice, attempt to practice, or offer to practice registered nursing in this State unless licensed by the [State Board of Nursing] to practice registered nursing."

For that violation, appellant received a 180–day suspended sentence.

Appellant is a midwife, and it was her practice of that profession that formed the basis for the conviction. The State's position was, and is, that only a registered nurse is allowed to practice midwifery, that the practice of midwifery therefore constitutes the practice of registered nursing, and that, as appellant was not licensed to practice registered nursing, she was in violation of § 8–701(a).

Appellant rejoins that § 8–701(a) does not apply to the practice of "traditional" midwifery, which is the form she practices. She acknowledges that, from at least 1978 to 1981,

the law required *all* midwives to be registered nurses, but she asserts that, when the Legislature amended the law in 1981, it either intentionally or inadvertently repealed that requirement and allowed non-nurses, and indeed persons unlicensed by anyone, to practice "traditional" midwifery. She adds that, if the current law does require midwives to be registered nurses, it would infringe on the Constitutional right of privacy possessed by her clients to choose an unlicensed midwife to aid in the delivery of their baby. She also complains that her motion to suppress certain statements made during her arrest should have been granted. We disagree with her contentions and shall affirm the judgment below.

## FACTS

In the early morning hours of December 19, 1994, a newborn baby boy was brought to the emergency room of the Carroll County General Hospital. Upon arrival, the baby was under full cardiac arrest; attempts to resuscitate him were unsuccessful.

■ Hospital personnel contacted Child Abuse and Sexual Assault Unit Investigator Gary Childs regarding the baby's suspicious death. Investigator Childs learned that the mother, Cynthia Morgan, had delivered her baby at home with appellant's assistance.

Appellant was hired by Mr. and Mrs. Morgan to perform prenatal care for Mrs. Morgan and to deliver their baby at home. She informed Mr. and Mrs. Morgan that she was not a certified nurse-midwife, but instead was a "traditional" or "lay" midwife.[1] The agreed-upon fee for her services was $1400.

---

1. In *Choice in Childbirth: Parents, Lay Midwives, and Statutory Regulation*, 30 St. Louis U.L.J. 985 (1986), the terms certified nurse-midwife and traditional midwife are distinguished. A certified nurse-midwife is a registered nurse who has taken additional training at a school of· midwifery approved by the American College of Nurse–Midwives. A traditional midwife is an empirically trained birth attendant who has learned the craft through apprenticeship.

Mrs. Morgan told the emergency room staff that her membranes had ruptured at approximately 4 a.m. on December 17, 1994, although she did not begin to feel contractions until 9 a.m. on December 18. Mrs. Morgan said that appellant arrived at approximately 3 p.m. on the 18th, performed an examination, and informed Mrs. Morgan that she was approximately 5 centimeters dilated. By 11 p.m., Mrs. Morgan was almost fully dilated. She began to push, and continued to push for approximately 4 hours.

When the head of the baby was apparent, appellant told the husband to call 911. Appellant reported that, just prior to delivery, the baby's heart rate was 120 to 130 beats per minute. When the paramedics arrived at the Morgan home, they observed that the baby was receiving C.P.R. and oxygen. The baby was soon thereafter taken to the hospital.

On December 20, 1994, Dr. J. Laron Locke performed an autopsy on the baby. The autopsy report indicated that the baby was a stillborn full-term baby and that maceration and his airless lungs indicated that the baby had died *in utero*. In his opinion, the baby died from infection resulting from chorioamnionitis, which is an infection of the maternal or placental membranes. The doctor stated that the baby died 24 to 48 hours prior to birth but was alive before the infection began because he had mounted a defense to the infection.

In the opinion of Dr. Nancy Petit, who extended prenatal care to Mrs. Morgan, proper medical attention would have detected that the mother and baby were suffering from an infection and that proper care could have prevented the baby's death. There was no evidence, however, that anything appellant did during the delivery process caused or contributed to the baby's death.

Appellant has never been licensed in Maryland as a practical nurse, registered nurse, or certified nurse. On January 19, 1995, the State obtained an arrest warrant for appellant, charging her with two counts of reckless endangerment and one count of practicing registered nursing without a license in violation of Md.Code Ann. Health Occupations art., § 8—

701(a). Pursuant to a plea agreement, the prosecutor entered a *nolle prosequi* on the charges of reckless endangerment and appellant pled not guilty to the practicing nursing without a license charge. After her conviction of that offense, this appeal ensued.

### DISCUSSION

### (1) *The Regulation of Midwifery*

As noted, the State's case rested on the proposition that the practice of midwifery constitutes the practice of registered nursing and that, as appellant is not a registered nurse, what she did constitutes a violation of § 8–701(a). To determine whether this is so, we need to examine both the present statutory scheme and the preexisting laws that it replaced, for the answer is not so clear as either side suggests merely from the current wording of the statute.

Section 8–701(a) says nothing about midwifery. It simply precludes the practice of registered nursing without a license. Section 8–710(a) makes the violation of § 8–701 a misdemeanor subject to a fine of $5,000 and one year in prison. Those sections are part of the Maryland Nurse Practice Act, which comprises title 8 of the Health Occupations article.

Section 8–101(f) defines the term "practice registered nursing" as

"[ (1) ] the performance of acts requiring substantial specialized knowledge, judgment and skill based on the biological, physiological, behavioral or sociological sciences as the basis for assessment, nursing diagnosis, planning, implementation and evaluation of the practice of nursing in order to:

(i) Maintain health;

(ii) Prevent illness; or

(iii) Care for or rehabilitate the ill, injured, or infirm."

The definition continues:

"(2) For these purposes, 'practice registered nursing' includes:

(i) Administration;

(ii) Teaching;

(iii) Counseling;

(iv) Supervision, delegation and evaluation of nursing practice;

(v) Execution of therapeutic regimen, including the administration of medication and treatment;

(vi) Independent nursing functions and delegated medical functions; and

(vii) *Performance of additional acts authorized by the [State Board of Nursing] under § 8–205 of this title.*"

(Emphasis added.)

Section 8–101(g) defines the term "registered nurse" as an individual licensed by the Board to practice registered nursing. Section 8–205, referred to in § 8–101(f)(2)(vii), authorizes the State Board of Nursing, among other things, to adopt regulations to carry out the provisions of the title, to set standards for the practice of registered nursing, to adopt regulations for the performance of "additional nursing acts" that "[r]equire education and clinical experience," and to adopt regulations for registered nurses "to perform independent nursing functions that ... [r]equire formal education and clinical experience." Section 8–301, which ties into § 8–701, requires that an individual be licensed by the Board before practicing registered nursing in the State.

So far as we can tell, midwifery is mentioned in only two parts of title 8. Section 8–503 directs the State Board of Nursing to appoint a peer review committee for each of three classes of nurses, one of which is "[c]ertified nurse midwives." It defines the term "[n]urse midwife," presumably for purposes of that section, as "a registered nurse who is certified under this title to practice nurse midwifery and who is also certified by the American College of Nurse Midwives." [2] The

---

**2.** We say that the definition is presumably for purposes of that section because we believe that is what the General Assembly intended, although the wording is not so clear. The section defines two terms—

principal reference to midwives is in subtitle 6, comprising §§ 8–601 through 8–603. That subtitle is captioned "Special Nurse Midwife Provisions."

Section 8–601 defines the term "[p]ractice nurse midwifery" as

"the management and care of essentially normal newborns and of essentially normal women antepartally, intrapartally, and postpartally [including]

(i) Family planning and well woman reproductive care;

(ii) The prescribing of substances commonly used in the practice of nurse midwifery as determined by the Board in consultation with the State Board of Pharmacy and the State Board of Physician Quality Assurance;

(iii) The prescribing of [specified controlled substances] commonly used in the practice of nurse midwifery as determined by the Board in consultation with [the aforementioned two Boards]; and

(iv) The dispensing of the substances prescribed in accordance with the provisions of subparagraphs (ii) and (iii) of this paragraph in the course of treating a patient at:

1. A medical facility or clinic that is operated on a nonprofit basis;

2. A health center that operates on a campus of an institution of higher education; or

3. A public health facility, a medical facility under contract with a State or local health department, or a facility funded with public funds.".

Section 8–602 states simply that "[t]he practice of nurse midwifery is governed by rules and regulations that are

---

nurse anesthetist and nurse midwife. As to the former, the section makes clear that the definition is for purposes of that one section. Because of the manner in which the section is subdivided, however, that limitation is not expressed with respect to the definition of nurse midwife. Nonetheless, there is no indication that the Legislature intended that definition, by virtue of its inclusion in § 8–503, to apply outside of that section. We think, rather, that the section was simply poorly drafted.

adopted under § 8–205 of this title *and that concern addition-al acts in the practice of registered nursing."* (Emphasis added.) Section 8–603 provides that an individual who was licensed as a nurse midwife on June 30, 1981 is governed by title 8 and any other provisions that concern additional acts in the practice of registered nursing that relate to the practice of nurse midwifery.

That appears to be the extent of the statutory regulation of midwifery. The heart of the regulatory scheme is in the regulations adopted by the State Board of Nursing, pursuant to § 8–205. They are found in COMAR, title 10, subtitle 27, chapter 5.

The first regulation, COMAR 10.27.05.01, defines "nurse midwifery" as "the health care management of newborns and clients throughout their reproductive life cycle," which seems to be considerably broader than the statutory definition. It also defines the term "certified nurse midwife" as "a regis-tered nurse who is certified by the [American College of Nurse Midwives Certification Council] and by the Board." COMAR 10.27.05.02 sets forth the requirements for certifica-tion as a nurse midwife. They include holding a current license to practice registered nursing in Maryland and a current certification as a nurse midwife by the American College and having a written agreement, approved by the Board, with a physician. Upon certification, the nurse mid-wife may, among other things specified in COMAR 10.27.05.06, perform "[i]ndependent management of clients appropriate to the skill and knowledge of the certified nurse midwife and the nurse midwife's agreement and protocols" and "[m]anagement, in collaboration with a physician, of clients with medical com-plications." COMAR 10.27.05.10 provides that, pursuant to Health Occupations article § 8–602, an individual may not practice nurse midwifery unless certified under these regula-tions or otherwise permitted by law to engage in those activi-ties.

It is apparent, then, that the requirement that a person be a licensed registered nurse in order to engage in the practice of

midwifery must rest either on finding that practice to be included within the definition of "practice registered nursing" in § 8–101(f) or on the combination of § 8–602 and the COMAR regulations just noted. There is no more specific requirement. We do not regard these provisions as quite so clear and unambiguous as either the State or appellant regard them. We need, then, to search for what the Legislature intended, and this requires an examination of legislative history.

The first incipient regulation of midwives in Maryland came in 1898, in an Act dealing principally with infectious diseases (1898 Md.Laws, ch. 436). In a new section 34F added to art. 43 of the Code, the Legislature required (1) that midwives register with the Registrar of Vital Statistics for the city or county in which they practiced, and (2) that they immediately notify the local health officer if they find a "lying-in woman" to have fever and refrain from attending "any other parturient woman or woman in child-bed" until authorized by the health officer.

The first comprehensive regulation came with 1910 Md. Laws, ch. 722. That Act required midwives to be licensed by the clerk of the circuit court but specified that the clerk could not issue a license unless the applicant had a certificate from the State Board of Health that he or she had successfully passed an examination given by the Board or that the applicant had engaged in the practice of midwifery prior to 1910. To be eligible to take the examination, and thus be certified, a non-grandfathered applicant, among other things, had to present (1) a certificate from a physician or hospital that he or she had attended at least five cases of childbirth and was competent to attend ordinary cases of labor, and (2) certificates from three reputable citizens that the applicant was of good moral character. The law precluded midwives from making vaginal examinations, attempting to deliver a retained placenta, attempting to use forceps, or attempting version or other forcible delivery. It also required them to report certain postpartum complications to a physician or the Health Commissioner.

The 1910 law was rewritten by 1924 Md.Laws, ch. 294. That Act made it unlawful for any person not licensed as a midwife or physician "to attend women in childbirth, habitually or for hire, except under the personal direction and supervision of a licensed practitioner of medicine." As with the 1910 enactment, existing midwives were grandfathered in, but all other persons had to obtain a license from the State Board of Health. In place of the examination required under the 1910 law, the requirement for licensure, aside from good moral character, was a determination by two physicians named by the Board that the applicant was qualified. Even licensed midwives were precluded from attending other than "normal cases of childbirth" and from administering drugs other than under the supervision of a physician. The State Board of Health was directed to keep an accurate registry of midwives and was charged with administering the law.

The 1924 law remained in effect until 1978, when the Legislature, for the first time, expressly required that an applicant for a license as a midwife (1) be licensed in Maryland as a registered nurse, and (2) be certified by the American College of Nurse–Midwives as a nurse midwife. 1978 Md. Laws, ch. 582. The licensing function was switched from the Secretary of Health and Mental Hygiene, who had succeeded to the duties of the State Board of Health, to the Board of Examiners of Nurses. The law also made clear that any person who violated the Act, including the provision that an unlicensed person may not "attend women in childbirth habitually or for hire," was guilty of a misdemeanor. The Act exempted from the new requirements any person holding an existing license; those persons could simply renew their licenses.

We come now to 1981 and the law that, with one amendment in 1990, now governs.

There were actually two bills enacted in the 1981 session dealing with midwives. The first was House Bill 1, which was a comprehensive Code Revision bill that enacted the Health Occupations article, revising the existing laws dealing with

those occupations. Because it did not purport to make any substantive changes in the existing 1978 law, the bill followed closely the format of that law. In § 7–602 of the new article, it provided that an individual had to be licensed by the Board before practicing midwifery habitually or for hire, unless he or she practiced under the personal direction and supervision of a physician. Section 7–603 stated that, to qualify for a license, an applicant, among other things, had to be a registered nurse and certified as a nurse midwife by the American College of Nurse–Midwives. Revisor's Notes to those sections informed the Legislature that the new language was derived from the existing law without substantive change; they also pointed out a number of gaps and discrepancies in the existing law.

During its drafting of the Health Occupations article, in the summer of 1980, the Commission to Revise the Annotated Code was sufficiently concerned about these discrepancies to ask that the Legislature study the midwife provisions during the 1980–81 interim with a view to making some substantive changes. A Staff Report dated July 18, 1980, pointed out:

"While the midwife provisions were drafted to cover both the 'granny' midwives who were required to have little formal education, and the registered nurses who have additional training in midwifery, through attrition, the only individuals currently governed or eligible to become licensed as midwives are the registered nurses who have additional training in midwifery."

The Staff Report further noted that, initially, the Commission had intended to draft the midwifery laws separately from the nursing provisions, but that, since the administration of the midwifery laws had been vested in the Nursing Board and since "currently the only individuals eligible to be or to become licensed as midwives in this State are registered nurses," the Committee had incorporated the midwifery provisions into the nursing law.

The second bill, House Bill 461, was obviously the attempt to review in substance the laws dealing with midwifery, as suggested by the Code Revision Commission, and to deal with

the concerns that it had expressed. The bill analysis indicates that the purpose of the bill was to "update the law regarding the practice of the profession of midwifery." That analysis also echoes the statement in the Code Revision Staff Report that

"there are now no longer any of the old 'granny midwives' in practice. Midwives are now registered nurses with advanced specialized training in midwifery. As such, they are capable of providing a higher level of health care (e.g. the administration of drugs under certain circumstances from a medical directive established by a physician)."

Finally, the bill analysis notes that House Bill 461 "repeals old sections of the law and establishes a more realistic framework reflecting the current practice of midwifery."

The bill repealed the sections enacted by House Bill 1 and substituted for them the simple statement that the practice of midwifery was "governed by rules and regulations that are adopted under § 7–205 [since amended to § 8–205] of this title that concern additional acts in the practice of registered nursing." As introduced, the bill continued to use the term "midwifery," notwithstanding that the caption of the subtitle was "SPECIAL NURSE MIDWIFE PROVISIONS." During the legislative process, letters were received from the State Department of Health and Mental Hygiene and the American College of Nurse–Midwives suggesting, among other things, that the term "nurse-midwifery" be used instead. The General Assembly accepted that suggestion and amended the bill to use the new term. Appellant seizes upon that change to argue that, by confining the regulatory scheme to "nurse midwives," the Legislature, intentionally or inadvertently, left unregulated the practice of "traditional" midwifery by persons who were not registered nurses.

There is nothing in the legislative history to indicate that substitution of the term "nurse midwife" or "nurse midwifery" for the unadorned noun "midwife" or "midwifery" was intended to limit the scope of the statute or to permit persons who were not nurses to practice midwifery. As noted, the Legisla-

ture had been twice informed that there were no "granny midwives" left, that all midwives in the State were nurses with special training in midwifery. It seems evident, then, that the Legislature, at the behest of the State Board of Nursing, the Department of Health and Mental Hygiene, and the American College of Nurse–Midwives was simply recognizing the reality (or what they apparently thought was the reality) that the only persons then practicing midwifery in Maryland were registered nurses.

It would be unreasonable to assume that, by adding the adjective "nurse" to the term, the Legislature intended to allow persons other than registered nurses with special midwife training to practice midwifery, when that had been expressly precluded since 1978, much less that it intended that persons could begin to practice midwifery without any license at all, which had been disallowed since 1910. The General Assembly was dealing specifically with a bill to update the law and to clarify gaps and deficiencies. Nowhere in the legislative files is there to be found even a hint of a desire to weaken the law. We certainly cannot assume such an intent; and we will not assume that the Legislature would make such a blunder by inadvertence.

■ When this history is considered, it becomes clear that, in enacting House Bill 461 (1981 Md.Laws, ch. 614), the Legislature intended not only to retain the requirement that to practice midwifery a person be a registered nurse certified by the State Board of Nursing, but to allow the Board to impose other requirements as well, by regulation. That explains the language in § 8–101(f), including within the definition of "practice registered nursing" the "[p]erformance of additional acts authorized by the Board under § 8–205 of this title." We therefore reject appellant's assertion that in enacting House Bill 461 the General Assembly either drew a distinction, which it never defined, between nurse midwifery and some other form of "traditional" midwifery, or that it returned the law essentially to what it had been before 1910. To conclude otherwise would be to give an illogical, unreason-

able interpretation to the law, and such constructions are always to be avoided. *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994). What appellant did falls clearly within the § 8–601 definition of "practice nurse midwifery." At the very least, she cared for an "essentially normal wom[a]n antepartally, intrapartally and postpartally."

## (2) *Constitutional Right to Privacy*

Upon the supposition that we might reach this conclusion regarding the meaning of § 8–701, appellant challenges its constitutionality, claiming that the statute violates "rights to privacy and freedom of personal choice in matters of childbearing protected under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." She claims third party standing to assert the rights of clients based on her business relationship.

At the outset, the State argues that appellant did not raise that constitutional challenge in the trial court, and thus the issue is not preserved on appeal. Although the argument was couched in somewhat different terms below, we believe that the point was raised and therefore preserved for appellate review. We shall also assume, for purposes of the argument, that appellant has standing to assert this right of privacy on behalf of her clients, although we make no finding in that regard.

Appellant contends that a mother has a fundamental right to decide "[w]here to give birth and whom to call on for assistance[.]" According to her argument, because a fundamental right is involved, the State must demonstrate that the statute can survive a strict scrutiny analysis—that the statute serves a compelling state interest and the State's objective could not be achieved by a less restrictive means. In support of her assertion that a fundamental right is involved, she cites cases finding such a right when necessary to protect procreative decisions. *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d

52 (1974); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

 Those cases are inapposite; there is no fundamental right at issue here. Section 8–701, as we have interpreted it, does not foreclose on a parent's right to engage the services of a midwife or on her right to give birth at home. The statute merely regulates who may engage in the practice of midwifery, just as other statutes regulate who may practice medicine. That is not the type of interest that has been found to be fundamental. *Sammon v. New Jersey Bd. of Medical Examiners,* 66 F.3d 639, 645 (3d Cir.1995); *see generally, Midwifery: State Regulation,* 59 A.L.R. 4th 929, § 5 pp. 937–38.

The requirement that a health practitioner be licensed has been upheld in cases involving procreative decisions. In *Connecticut v. Menillo,* 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975), the Court, in a *per curiam* decision, upheld a State statute that allowed only licensed physicians to perform abortions. The Court made clear that "the rationale of our decision [in *Roe v. Wade* ] supports continued enforceability of criminal abortion statutes against nonphysicians." *Id.* at 10, 96 S.Ct. at 171. "Even during the first trimester of pregnancy, therefore, prosecutions for abortions conducted by nonphysicians infringe upon no realm of personal privacy secured by the Constitution against state interference." *Id.* at 11, 96 S.Ct. at 171.

Other States have addressed the specific issue in the case at bar and have refused to extend a woman's right to privacy to include her choice of whomever she wishes to assist her during childbirth. *See Leigh v. Board of Registration in Nursing,* 399 Mass. 558, 506 N.E.2d 91 (1987) (rejecting claim that regulation of midwifery interferes with any fundamental rights); *People v. Rosburg,* 805 P.2d 432, 437 (Colo.1991) (holding that the right to privacy "does not include the personal choice of whether to utilize a lay midwife to assist in childbirth"); *State v. Kimpel,* 665 So.2d 990, 994 (Ala.Cr.App.),

*cert. denied,* —— U.S. ——, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995) (stating that the argument that midwifery statute is unconstitutional because it constitutes an invasion of privacy is without merit); *Bowland v. Municipal Court,* 18 Cal.3d 479, 134 Cal.Rptr. 630, 556 P.2d 1081 (1976) (holding that state regulation of midwifery should not be reviewed under strict scrutiny standard).

 Accordingly, because no fundamental right is involved, the statute receives a rational basis review—whether the law is rationally related to a legitimate state interest. *Sammon, supra,* 66 F.3d at 645. The health and welfare of the mother and child are legitimate state interests. *Roe, supra,* 410 U.S. at 163–64, 93 S.Ct. at 731–32. The sole function of the provisions regulating midwifery is to ensure that those who seek to engage in and offer their services as midwives are properly trained. We conclude that the regulatory scheme is rationally related to that interest.

### (3) *Motion to Suppress*

Appellant made several incriminating remarks at the time of her arrest. She argues that, because the statements were made before she was given her *Miranda* [3] warnings, her Fifth Amendment rights were violated. The trial court ruled that appellant's statements were admissible because they were voluntary and were not made in response to interrogation.

At the suppression hearing, two stories emerged as to what caused appellant to make the incriminating remarks. Investigator Childs testified that, on January 20, 1995, at approximately 7:50 a.m., he and Maryland State Police Trooper J.N. Newcomer arrived at appellant's home, identified themselves, and advised appellant that there was an arrest warrant for her and that they had to take her to Westminster Barracks.

Investigator Childs stated that, because appellant had several young children present, he permitted her to use the

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

telephone to call her parents for the purpose of taking care of the children. After appellant called her father, she said that she was not embarrassed to talk about her work in the presence of her children. At that point, Investigator Childs told her what the charges were against her.

Childs testified that

"[a]fter hearin' what the charges were, [appellant] went through a litany of things. She was just—I think she was angered at the charges and she was angered at—maybe not me, personally, but me as a representative of the State's Attorney's Office, and she stated a number of things that I wrote down as she was saying them, or immediately after she said them.

. . .

She said, 'I don't believe in the need to be a nurse.'

'It's a man's world and they make the laws. Women are the only ones having the babies. I've delivered over 100 babies, some for nurses and even for licensed midwives.'

'Women need to be in a natural setting when they give birth to children. They don't need medicines or to be cut. I provide the service they want without all the unnatural things that take place in a hospital.'

'I have four women right now who are in my care and are about to deliver. What am I supposed to tell them?' "

Childs stated that, while appellant was talking, he "didn't ask her anything."

Appellant's testimony contradicted that of Childs. She recalled that Childs specifically asked her several questions, and that is how the incriminating remarks surfaced.

The trial court ruled that

"I find that [appellant] made those statements, they were in the form of blurt outs, they were not the result of any interrogation by Mr. Childs. And it would be somewhat difficult for me to figure what type of a question or questions Mr. Childs could have asked and get those four responses. So, I do not accept the testimony of [appellant]

that she was interrogated by Mr. Childs. I think she's completely wrong and I do find completely believable Mr. Childs' testimony that there was absolutely no interrogation."

■ Appellant challenges the trial court's determination of Investigator Childs' credibility. In reviewing the trial court's conclusions, we "accept the trial court's determination of fact, unless we conclude that the fact-finding is clearly erroneous, giving due regard to the trial court's opportunity to judge the credibility of the witnesses." *Boyer v. State,* 102 Md.App. 648, 652–53, 651 A.2d 403 (1995). The trial court found Childs' testimony "100 percent believable." Appellant asserts that the trial court credited Childs' testimony (and thereby discredited appellant's testimony) because the court had a strong predisposition in favor of Childs prior to the hearing. Appellant attacks the impartiality of the trial court because in its ruling, the court referred to the fact that Childs had testified before the court in a previous case and that the judge held Childs in the "highest degree for truthfulness, accuracy, and professionalism."

■ " 'There is nothing inherently improper about a judge deciding the credibility of a witness who has previously appeared before that judge [as long as the] judge, sitting as the trier-of-fact, base[d] his or her determinations solely on the evidence presented in the case at bar.' " *Burgess v. State,* 89 Md.App. 522, 548, 598 A.2d 830 (1991), *cert. denied,* 325 Md. 619, 602 A.2d 710 (1992) (quoting *Turman v. United States,* 555 A.2d 1037, 1038 (D.C.App.1989)).

■ Appellant did not raise the issue of impartiality at trial. She made no motion for recusal. Therefore, the issue is not preserved. Furthermore, even if the issue was preserved, we would conclude that the trial court based its credibility determination on the evidence elicited at the hearing. In its ruling, the trial court explained the reason why it discredited appellant's testimony:

"When [appellant] was on the stand, a number of times, in response to questions from her counsel and some questions

from the Court, she said, 'I do not remember.' She said, 'My daughter could have made the phone calls to my parents.' I don't believe that. I believe that it was she who made the phone calls to her parents. I do not believe her testimony that Mr. Childs denied her the right to make a phone call to her lawyer before they left the house. I think [the State's attorney] hit it on the head that she probably expected to see someone from law enforcement coming to her front door as a result of the death of the Morgan baby, that she was upset, there probably was grief on her part, and she does not completely remember what she said that morning at the house with Gary Childs."

We conclude that the trial court impartially decided the issue of credibility of the witnesses and made its determinations solely on the evidence presented.

 Accepting Investigator Childs' version of the facts, we now address the question of whether appellant's incriminating remarks were admissible. The admissibility of the statements depends on whether they were made "freely, knowingly, without coercion or inducement." *Hof v. State,* 337 Md. 581, 600, 655 A.2d 370 (1995). Whether the officers informed appellant of her *Miranda* rights before she made the incriminating statements is not the cornerstone of the determination of voluntariness. Instead, all the circumstances under which the statements were made need to be considered. *Id.*

 We agree with the trial court that appellant's statements were blurts. Whether, as Investigator Childs supposed, they were the product of anger, we cannot tell, but it is certain that the statements were not the product of any coercion or inducement by Investigator Childs. Statements that are blurts do not require a *Miranda* warning or waiver. *Brashear v. State,* 90 Md.App. 709, 720–21, 603 A.2d 901, *cert. denied,* 328 Md. 92, 612 A.2d 1315 (1992). "[W]ithout the establishment of compulsion ... the gears of the Fifth Amendment privilege are not engaged. There is no privilege against inadvertent self-incrimination or even stupid self-incrimination, but only against compelled self-incrimination."

*Ciriago v. State,* 57 Md.App. 563, 574, 471 A.2d 320, *cert. denied,* 300 Md. 152, 476 A.2d 721 (1984). Accordingly, we find appellant's statements admissible.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.