586 A.2d 70

Jeanette **CHERRY**

v.

**STATE of Maryland.**

**No. 584, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Feb. 28, 1991.

Brian J. Murphy, Baltimore, for appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before GARRITY, ALPERT and ROSALYN B. BELL, JJ.

ALPERT, Judge.

Late in the evening of August 18, 1988, Jeanette Cherry, the appellant, arrived in Baltimore by train from New York City with 17 glassine bags of heroin, one of marijuana, and one of cocaine secreted on her person. After an encounter with certain members of the Baltimore City Police Department, which we shall describe later in some detail, the illicit drugs were discovered and confiscated. The discovery of the drugs led to the issuance of two grand jury indictments against the appellant: the first charged her with possession of heroin with intent to distribute, possession of marijuana, and possession of cocaine; the second charged her with the unlawful importation into the State of Maryland of "4 grams or more of Morphine or Opium or any derivative, salt, isomer, or salt of an isomer of Morphine or Opium."

Appellant moved to suppress the drugs from evidence on the ground that their seizure violated her Fourth Amendment right to be free from unreasonable searches and seizures. She moved also for dismissal of the second indictment containing the importation count on the ground that it was duplicitous. A hearing on the motions was held before the Honorable Roger Brown in the Circuit Court for Baltimore City. At the conclusion of the hearing, both motions were denied. Appellant was subsequently tried before Judge Brown on an agreed statement of facts and found guilty of all charges. She received concurrent prison sentences of fifteen years for possession of heroin with intent

to distribute, one year for possession of marijuana, four years for possession of cocaine, and fifteen years for unlawful importation. All but six years of the sentences were suspended in favor of three years probation.

Appellant now appeals that judgment and challenges the trial judge's denial of her pre-trial motions. Specifically, she asserts that:

1. The trial court erred in finding that the State met its burden of proving consent to search; and that

2. The trial court erred in denying appellant's motion to dismiss the importation count for duplicity.

We disagree with both assertions, and shall affirm the judgment of the trial court.

## I.

Because appellant's first challenge is to the trial judge's denial of her motion to suppress, our review is limited to those facts produced at the suppression hearing which are most favorable to the State as the prevailing party on the motion. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *see also Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22 (1990); *Trusty v. State,* 308 Md. 658, 521 A.2d 749 (1987). Those facts are as follows.

Detectives Debra Evans and Glen Olivi, members of the police department's narcotics interdiction squad, received information from their superiors that three Amtrak passengers, one female and two black males, would be arriving in Baltimore about 11:00 p.m. carrying controlled dangerous substances. The detectives went to Penn Station to greet the arrival of Amtrak's Merchant Limited coming from New York City. When the train arrived at 10:28 p.m., a number of passengers disembarked, including two black males and the appellant, a black female. The trio walked together through the concourse and out the main door of the train station, turned right, and headed up Charles Street. Appellant was carrying a handbag and a plastic bag. Detectives Evans and Olivi, dressed in plainclothes,

followed the three passengers out of the train station and walked up to them on Charles Street. They did not tell the passengers to stop.

Detective Evans approached appellant and identified herself as a police officer verbally and by displaying her badge and identification card. She asked appellant if she would mind talking to her, and appellant replied "no," she didn't mind. At this point the two men accompanying appellant walked hurriedly away in separate directions. The detectives made no effort to stop them. Appellant stayed standing on the sidewalk next to Detective Evans; Detective Olivi stood about seven feet away.[1] Neither officer displayed a weapon or told appellant to stop or to stay with them.

Detective Evans asked appellant where she was coming from; appellant replied "New York." Detective Evans asked if she could see appellant's ticket; appellant replied she had left it on the train. Detective Evans asked appellant if she knew the two men she had been walking with; appellant replied that she did know them and that they were going to catch a taxi together. Detective Evans pointed out that they had just walked past a number of waiting taxicabs outside the train station and asked appellant why they had not taken one of those taxis. Appellant did not reply. Detective Olivi then told appellant that Baltimore City was experiencing a problem with people bringing narcotics into the city by train. At this point appellant became visibly nervous and began shaking and trembling. She said she had to leave to go to school at Coppin State College. Detective Evans stated that it was eleven o'clock at night and no school was in session at that time.

Detective Evans then asked appellant if the officers could search her bags. Appellant said "yes," and handed her bags to the officers. Nothing was found in the bags.

---

1. Detective Evans testified that appellant was about 5'8" tall; she described herself as a 5'4" tall black female, and described Detective Olivi as a 5'3" or 5'4" tall white male of average weight.

Detective Evans gave appellant the bags back, and asked if she could search her. Appellant again said "yes." Detective Evans conducted a pat-down search and felt a plastic bag in appellant's groin area. She asked appellant what it was and appellant said she was menstruating. Detective Olivi asked appellant if she had any pads or tampons with her; appellant looked into her bags, but found none. Detective Evans asked appellant if she would mind going to the police interview room to continue the search. Appellant agreed to go to the interview room with the officers. The three walked back into the train station to the police interview room. Detective Evans walked in the middle of the group. Appellant was not touched or restrained in any way. Detective Evans testified that appellant was free to leave if she wanted to.

When the group entered the interview room they were joined by a third plainclothes detective, Christopher Rayburn. Detective Rayburn observed appellant to be "nervous" and "very upset," looking as if she was about to cry. Because of her demeanor, and based upon his prior experience with narcotics offenders, Detective Rayburn asked appellant if she had any drugs on her. Appellant replied "yes." Detective Evans then accompanied appellant into the bathroom, where appellant removed a plastic bag containing the aforementioned drugs from the crotch of her pants. She handed the plastic bag to Detective Evans and was placed under arrest.

Appellant neither testified at the hearing nor presented any evidence. Defense counsel argued that the search of appellant without a warrant was in violation of the Fourth Amendment and that it was not consented to by appellant. In his argument defense counsel repeatedly emphasized appellant's nervous appearance and the fact that she was not told by the detectives that she was free to leave and free to refuse permission for the search. The suppression hearing judge noted that there is no absolute requirement that citizens be informed of this right in these kinds of situations, and that under the circumstances testified to in

this case the State had shown by a preponderance of the evidence that the consent was voluntary.

We are now asked to review the constitutionality of the search. In so doing, we extend great deference to the fact-finding of the suppression hearing judge with respect to determining the credibility of the witnesses and to weighing and determining first-level facts. *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356 (1990). But as to the ultimate, conclusionary fact of whether appellant's consent was truly voluntary, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of this case. *See Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990); *Perkins*, 83 Md.App. at 346, 574 A.2d 356.

■■■■■ We begin by noting that a search conducted without a warrant supported by probable cause is *per se* unreasonable under the Fourth Amendment, subject to only a few exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). However, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* The State bears the burden to prove, by a preponderance of the evidence, that consent to search was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *State v. Wilson*, 279 Md. 189, 201, 367 A.2d 1223 (1976). Consent that is coerced by threats or force, or granted only in submission to a claim of lawful authority, is not voluntary. *Doering v. State*, 313 Md. 384, 402, 545 A.2d 1281 (1988). Moreover, coercion may be either explicit or implied, and in reviewing instances of alleged consent courts must take into account subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. *Bustamonte*, 412 U.S. at 229, 93 S.Ct. at 2048. The State is not required to prove, however, that the person who allegedly consented knew or was warned that he or she had a right to refuse consent; rather voluntariness is a question of fact to be

determined from the totality of the circumstances. *Busta-monte, supra; Gamble v. State*, 318 Md. 120, 125, 567 A.2d 95 (1989).

Turning to the facts of this case, we begin by examining whether there was a "seizure" of appellant's person prior to the search resulting in the discovery of the drugs. We do so because, although not fully articulated, appellant seems to imply in her argument that the search was somehow "tainted" by a prior illegal seizure of her person. *See Wilson, supra* [279 Md.] at 203–04, 367 A.2d 1223.

A person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident in question, a reasonable person would have believed that he or she was not free to leave. *United States v. Mendenhall*, 446 U.S. 544 at 554, 100 S.Ct. 1870 at 1877, 64 L.Ed.2d 497 (1980). Examples of circumstances that might indicate a seizure, include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person by an officer, or the use of language or tone of voice indicating that compliance with a request might be compelled. *Id.* at 555, 100 S.Ct. at 1877.

In this case most of the questioning took place on a public street. The two police officers were dressed in plainclothes and did not display weapons. They did not summon appellant into their presence, but instead approached her and identified themselves as police officers. They told appellant that they were narcotics enforcement officers. Of particular significance, appellant was able to observe that as soon as the officers identified themselves her companions walked away and the police made no effort to stop them. Appellant was not seized simply because the officers approached her and asked her a few questions. We find nothing in the record to indicate that appellant had an objective reason to think that she was not free to terminate the conversation and walk away, as her companions did. *See Mendenhall, supra,* at 555, 100 S.Ct. at 1877. Thus we conclude that

appellant was not "seized" within the meaning of the Fourth Amendment.

Our conclusion does not change in considering the fact that appellant was asked to accompany the police to the Amtrak police interview room. Appellant asserts that under *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the taking of appellant into a "police room" without advising her that she did not have to go there was a seizure of her person. The facts of *Royer* are somewhat similar, but there is a crucial difference. Royer was approached in an airport by two plainclothes detectives because he fit a "drug courier profile." The detectives identified themselves as narcotics officers and told Royer he was suspected of transporting narcotics. They asked Royer to show them his drivers' license and airline ticket, and when he did so the detectives took the documents and did not return them. They then asked Royer to accompany them to a police room adjacent to the concourse, without advising him he was free to depart. The Supreme Court, in a plurality opinion authored by Justice White, found that Royer was "seized" within the meaning of the Fourth Amendment because the officers had made a sufficient showing of lawful authority such that a reasonable person would not have believed he was free to leave. 460 U.S. at 501–02, 103 S.Ct. at 1326–27. We find it very significant that Royer was told that he was the focus of a drug investigation and that the police confiscated, on the spot, two very important documents from him. Those things were not done in this case. Nothing was taken away from appellant during the questioning, so that appellant was not placed in the position of having to abandon her property if she decided to leave. There was no evidence in the record of any resistance or hesitation on appellant's part. She was not commanded to come with the detectives; she was requested to come. She was not touched or surrounded on

the way back into the station.[2]  Further, as we have noted before, appellant had just observed her companions walk away unaccosted.  While we do not have any evidence before us as to appellant's subjective state of mind, we do have the testimony of Detective Evans that at all times until appellant actually produced the drugs from her clothing, she was free to go.  The suppression hearing judge made no finding that Detective Evans' testimony was incredible, and we make no such determination here.  Under these circumstances, we adhere to our conclusion that appellant was not "seized" within the meaning of the Fourth Amendment.  We therefore reject appellant's suggestion that her consent was somehow "tainted" by a prior illegal seizure.

Turning our focus more generally onto the nature of appellant's consent to search, we are reminded that "the question is not whether the [appellant] acted in her ultimate self-interest, but whether she acted voluntarily." *Mendenhall*, 446 U.S. at 559, 100 S.Ct. at 1879.  From the evidence before us there is no indication that there was any threat, trickery, show of force, or false reliance on a warrant. *See, e.g., Perkins v. State*, 83 Md.App. 341, 574 A.2d 356 (1990); *Titow v. State*, 75 Md.App. 555, 542 A.2d 397 (1988).  Appellant was not restrained in any way; she was not given any express commands.  We cannot say her consent to the search resulted from any overt coercion.

Appellant points out, however, that in examining the totality of the circumstances account must also be taken of "subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."

---

**2.** Compare Detective Olivi's position here with his position in *Riddick v. State*, 319 Md. 180, 571 A.2d 1239 (1990).  Here Detective Evans walked in the middle, appellant on one side, and Detective Olivi on the other side.  In *Riddick* one officer walked in front of Riddick and Detective Olivi and another officer walked behind him, prompting the trial judge to speculate that Detective Olivi and the other officer got behind Riddick to prevent him "from changing his mind." 319 Md. at 189–90, 571 A.2d 1239.  In this case Detective Evans testified that she and Detective Olivi took care not to surround appellant.

*Bustamonte,* 412 U.S. at 229, 93 S.Ct. at 2049. Here she claims that the police officers' questions coupled with their expressions of disbelief in her answers are the "very definition" of subtly coercive police questions. We disagree. As the Supreme Court has stated, "[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Mendenhall,* 446 U.S. at 553, 100 S.Ct. at 1876, quoting from *Terry v. Ohio,* 392 U.S. 1, 34, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968) (White, J., concurring). The Court has also recognized society's need for police questioning as an effective tool of law enforcement. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877; *Bustamonte,* 412 U.S. at 225, 93 S.Ct. at 2046; *see also Grant v. State,* 55 Md.App. 1, 4, 461 A.2d 524 (1983). We do not view it as overreaching for a police officer to point out that the answers to his or her questions are inconsistent or don't make sense.

Appellant asks us to consider also her "possibly vulnerable subjective state of mind" as evidenced by her nervousness. It is, of course, quite tempting to conclude that there must be something "wrong" with a person who would consent to a search which yields incriminating evidence. There are many reasons why a person might do so, however, and while they may prove to be unwise, they are not involuntary. A person may think the evidence is so well hidden that the police will not find it; a person may feel that to refuse consent will leave him under a cloud of suspicion; a person may feel that cooperation may bring leniency; and finally, a person with knowledge of his own guilt may have an unconscious desire to be caught and punished. None of these reasons is the product of governmental coercion. The only evidence in this case as to appellant's subjective state of mind is that she appeared very nervous. There was no evidence that she was a minor, or of low intelligence, or suffering from any mental disorder. The encounter was brief; she was not confined, or deprived of food or water or sleep. There is nothing to

suggest racial intimidation or physical intimidation.[3] It is true that appellant's nervousness did increase the police officers' suspicions about her, based upon their experience that guilty people often become nervous in any encounter with the police. Indeed, it was her nervousness that prompted Officer Rayburn to ask her if she was carrying drugs. But in the absence of any other evidence as to a vulnerable subjective state of mind, we will not hold that the police may not address questions to nervous people. The "internal coercion" of a guilty conscience is not our concern. The police are not restricted in this type of investigation to the self-confident and the brash sociopath. In summary, we hold that the appellant's consent to search was voluntary and that the suppression hearing judge did not err in refusing to exclude the drugs from evidence.

### 2.

Appellant next challenges the denial of her motion to dismiss the importation charge on the ground of duplicity. She was charged with a violation of Md.Ann.Code, art. 27, § 286A(a), which provides:

(a) A person who brings into this State any of the following controlled dangerous substances which it is unlawful for that person to possess, in the amounts indicated, upon conviction, is subject to the penalty provided in subsection (b) of this section.

(1) 100 pounds or greater of marijuana;

(2) 28 grams or greater of cocaine or any mixture containing 28 grams or greater of cocaine;

(3) 4 grams or more of morphine or opium or any derivative, salt, isomer, or salt of an isomer of morphine or opium;

(4) 1,000 dosage units of lysergic acid diethylamide or any mixture containing the equivalent of 1,000 dosage units of lysergic acid diethylamide;

---

3. See notes 1 and 2, *supra.*

(5) 28 grams or more of phencyclidine in liquid or powder form or 112 grams or more of any mixture containing phencyclidine;

(6) 1,000 dosage units or more of methaqualone; or

(7) 28 grams or more of methamphetamines or any mixture containing 28 grams or more of methamphetamine.

The grand jury's indictment stated the date and location of the offense, cited "Sec. 286A(a)," and charged that appellant "unlawfully did bring into the State of Maryland 4 grams or more of morphine or opium, or any derivative, salt, isomer, or salt of an isomer of Morphine or Opium;[4] contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State." Appellant claims that because the indictment uses the disjunctive "or," rather than the conjunctive "and," it in fact charges her with at least six different acts and is thus duplicitous. We disagree.

The elements of an offense under § 286A(a) are that the defendant: (1) brought into the State of Maryland; (2) the indicated amount of controlled dangerous substances. *See Rose v. State*, 74 Md.App. 644, 648, 539 A.2d 1142, *cert. denied*, 313 Md. 31, 542 A.2d 858 (1988). The language of subparagraph (3) proscribes importation of a given amount of only one class of controlled dangerous substances, *i.e.*, opiates. Morphine and opium are both defined as a "narcotic drug" of the "opiate" type by Article 27, § 277(q). We reject appellant's assertion that morphine and opium are "chemically distinct." The substantive distinctions in § 286A(a) are among the different subparagraphs (1) through (7), not within the various subparagraphs. The trial judge did not err in refusing to dismiss the indictment charging appellant with unlawful importation.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.

---

4. Heroin is an opium derivative. *See* Article 27, § 279(a)(3)(b).