698 A.2d 1155

### In re JOSHUA DAVID C.

**No. 1492, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Aug. 29, 1997.

582

Margaret L. Lanier, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Gwynn X. Kinsey, Jr., Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, David J. Taube, Staff Attorney, Baltimore, and Lisa Thayer Welch, State's Attorney for Garrett County of Oakland, on the brief), for Appellee.

Submitted before MURPHY, C.J., HOLLANDER, J., and JOHN J. BISHOP, Judge (retired), Specially Assigned.

HOLLANDER, Judge.

The Circuit Court for Garrett County, sitting as the juvenile court, found that appellant, Joshua C., committed the delinquent acts of malicious burning of a building and misdemeanor theft.[1] At the time of the delinquent acts, Joshua was ten

---

1. Three other boys were involved in the underlying incident. Jimmy and Robbie K. were tried with appellant and were found to have committed the same delinquent acts. They are not parties to this

years old. At disposition, the court placed appellant on probation and ordered restitution in the amount of $62.85. Appellant timely noted his appeal and presents two questions for our review, which we have rephrased slightly:

I. Did the motion judge err in denying appellant's motion to suppress his confession?

II. Did the trial judge err in admonishing a State's witness to tell the truth?

As we answer appellant's first question in the affirmative, we shall vacate the court's findings and remand the matter to the court for further proceedings. Therefore, we decline to address appellant's second question.

## I. FACTUAL SUMMARY—MOTION TO SUPPRESS

At the hearing on appellant's motion to suppress, John Sines, chief of the Oakland Police Department, was the sole witness. He testified that he was called to the Farm Fresh Building, a wooden structure owned by the Town of Oakland, at approximately 10:10 a.m. on July 23, 1996, in response to an attempted burning of the building that had occurred during the prior evening. He observed eight cigarette lighters in the vicinity that had all been spray painted. After the chief developed several suspects, including appellant, he proceeded to appellant's house. Neither appellant nor his mother was home, but Sines left a message with appellant's sister that he wanted to speak with appellant and his mother.

Later that day, at approximately 5:30 p.m., Ms. C., Joshua's mother, brought him to the police department, located at city hall. Sines initially met with both appellant and his mother in his office and explained that he wanted to discuss the burning at the Farm Fresh Building. According to Sines, Ms. C. did not object to the interview. To the contrary, she encouraged her son to tell the truth. Chief Sines testified that he did not have to introduce himself, because appellant and Ms. C.

appeal, however. In addition, Eric S. admitted his guilt to the police, but was not prosecuted. All of the boys were first-time offenders.

already knew him, and appellant was aware that Sines was the chief of police. The chief initially stated that he was in uniform during the interview, but later indicated that he was not sure how he was dressed. During the interview, Chief Sines sat behind his desk and appellant and Ms. C. sat across from him.

Soon after appellant's arrival, in the presence of his mother, Sines advised appellant of his rights, pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by reading from a waiver form. The chief explained that he "made sure [appellant] understood," and he advised appellant that "what you should do, Josh, is tell the truth." Neither appellant nor his mother had any questions. Nor did either one request an attorney. Although appellant said he understood, Sines conceded: "I don't think he understood a lot of those questions." Moreover, when asked if, in his opinion, appellant understood his *Miranda* rights, the chief responded, "He's ten years old." In any event, appellant signed the waiver form by printing his name.

Initially, appellant denied any involvement in the burning. Chief Sines thought appellant might not want to reveal his involvement in the presence of his mother. Accordingly, after about fifteen or twenty minutes, Chief Sines "suggested" to Ms. C. that it would be "better" if he spoke with appellant "one-on-one," and that Ms. C. "should go out to the next office." Ms. C. then left appellant alone with the chief. Thereafter, Sines asked appellant to bring his chair closer to him so that they could talk, and he said something along "the lines of, 'Josh, your mom's not in the room, just you and me here. How about you telling me the truth finally, and we can take a statement.' "

Approximately one half hour after Ms. C. left the chief's office, appellant confessed. His statement was formalized in writing, using a question and answer format. After the written statement was obtained, appellant's mother returned to the room. Chief Sines testified that when Ms. C. returned to the office, she did not voice any concern about the state-

ment. Rather, she "was glad he told the truth...." At approximately 7:00 p.m., the interview was completed and appellant departed with his mother.

Chief Sines denied telling Joshua that he could not leave the room, threatening appellant, or making any promises to him in order to induce the confession. The chief added that he did not believe that appellant was "afraid" of him, because they "know each other very well." Nevertheless, during cross-examination, the following colloquy ensued:

Q. [DEFENSE COUNSEL:] Do you recall making a statement to Josh that you'd tell your wife to hold dinner or you had all night to stay there with him if need be?

A. Right. I didn't get home until about nine o'clock that night.

Q. But do you recall telling Josh that you'd stay there as long as you had to get him to tell the truth?

A. I'd stay there as long as it takes. You know, we're not in no hurry here. That's what I was trying to express to him.

Chief Sines also conceded that he was aware that appellant was taking the medication Ritalin for a condition known as attention deficit disorder.[2] In addition, he acknowledged that appellant expressed an interest in some tee shirts that the police department had on display. The following testimony is relevant:

Q. [DEFENSE COUNSEL:] Do you recall some tee shirts that the Police Department had on display?

A. Right.

Q. And do you recall Josh being interested in getting one of those tee shirts?

A. All kids like those tee shirts, yes.

---

2. We note that the record does not reflect the nature of the disorder or the extent to which appellant was affected by it. Nor does the record indicate whether the Ritalin was effective in controlling Joshua's disorder.

Q. And did you ever indicate to him that he could get one of those tee shirts if he told you the truth?

A. Okay. Kathy [appellant's mother] and I—Kathy wanted to buy one of those tee shirts for her son. It was $12. It wasn't my idea to say like, "Josh, if you tell me the truth, you'll get one of these tee shirts." It was an idea to get him to tell the truth. His mother was going to like reward him for telling the truth, that kind of thing. It wasn't an ultimatum, "You don't get a shirt if you don't tell me the truth."

Q. But Josh didn't know about this conversation you had had with his mother, did he?

A. He could have been in the room when we was talking about that. I don't know for sure.

Q. But this was a conversation between you and Kathy C. and then did you go and then tell Josh that he could get a shirt if he told the truth? Even though his mother was going to buy it, he didn't know that though, did he?

A. I don't know if he knew that or not.

Q. But wasn't that statement made to Josh that he could get a shirt by telling the truth?

A. I don't recollect. It could have been. I could have said that.

Q. But it could have. Were there any discussions about him getting a tee shirt?

A. Oh, I think they bought one at the end—before they left, I think they did buy one or later get one.

Q. But had you discussed that with Josh prior to that?

A. I don't think so, I did.

At the conclusion of the testimony, the judge summarized the evidence:

As I understand the testimony, Chief Sines investigated a burning.... [H]is investigation led him to Ms. C.'s house, as well as others, to talk to her son. They weren't there. He left a note with ... some relative ... that when she and her son came in to come down. They came down about 5:30

in the evening to the Town Hall at a time when everybody had gone home and Chief Sines was awaiting them. Perhaps someone else showed them in. They arrived with his mother [sic]. They talked about some things. Josh specifically denied the incident occurred. His mother asked him to tell the truth. So did Chief Sines. *At some point, Chief Sines,* I assume while his mother was present—well, I don't assume; that's what the evidence is, *advised Josh of his—of Miranda warnings.* I didn't say "of his" because *I think as Chief Sines says, who knows whether he understood it or not.* He understood probably some of the things. I think, though, he understood that this was serious stuff that Chief Sines was talking with him, and certainly his mother was there and she knew what those things were, the statements and questions and rights were.

In addition to that, Chief Sines ... suggested to his mother, Josh's mother, that perhaps she'd leave the room and he'd talk one-on-one with him to see whether that would be more productive and I have the understanding that *Josh's mother was* as interested in getting to the bottom of it as anyone else and *she was, in a sense, I guess, working with Chief Sines.* Anyway, she left and they then stayed together approximately a half an hour where Chief Sines talked to him and he told him some things that happened and then he got out a paper and wrote those things down in an orderly fashion and took their good time doing it, which took about a half an hour or so. Josh's mother came back in and John Sines talked with her about the whole situation and then they went on home.

Apparently, they did buy a tee shirt or did not buy a tee shirt or something of that nature.

(Emphasis added).[3]

Thereafter, defense counsel argued that appellant did not voluntarily and knowingly waive his rights and did not volun-

---

**3.** Based on our resolution of the suppression issue, we need not fully recount the additional evidence adduced at trial. For completeness, however, we note the following: At trial, the State introduced the

tarily confess. He claimed that the interview constituted custodial questioning and that, because of appellant's age and his attention deficit syndrome, he did not understand his *Miranda* rights. Moreover, he contended that the rights were personal and thus could not be waived by appellant's mother. In denying appellant's motion, the judge said:

> [A]s I understand from the facts that I recited earlier, that then Josh was brought into the Town Hall by his mother, they left together. [Defense Counsel], I just do not see that he was under arrest. If Chief Sines had gone out and put him in the police car, put handcuffs on him or took him into custody somehow, I could agree with you. I don't think young Joshua was under arrest at all, and when he was down there, he was read the *Miranda* warnings and as you point out, and perhaps he could have been talking about a Happy Meal at McDonald's across the street, I don't know, but Chief Sines says that he has known this young man. The young man was not afraid of him. I think that's very important. He knew his mother. His mother knew him. They were talking amongst themselves and as [the State's Attorney] points out, *Miranda* is not, in itself, a part of the

---

cigarette lighters and photographs of the damage to the building. In addition, over defense objection, appellant's statement was admitted, in which he said that he stole several cigarette lighters from Naylor's Hardware Store and then went with the other boys, who had also stolen cigarette lighters, to the Farm Fresh Building. There, they attempted to ignite the lighters and set the building's walls on fire. Eric S., appellant's eleven-year-old cousin, testified for the State after the State agreed not to prosecute him. He explained that the boys put the stolen cigarette lighters on the ground and on a bench and created sparks by lighting some of the lighters, and then using other lighters as fuel. They stepped on them, however, in an effort "to make the sparks stop." In the process, the wall of the building and a bench were burned.

Donald Mason, the manager of the Naylor's Hardware Store in Oakland, testified that the lighters found at the scene were the same kind sold by Naylor's. He estimated the cost of the lighters at less than one dollar a piece. Asa McCain, Jr., the Mayor of Oakland, testified that the damaged property belonged to the town and that it would cost approximately $62.85 to repair the building.

Kathy C., appellant's mother, testified for the defense. She stated that appellant and Eric were at home with her when the incident occurred.

Constitution. It's an assurance that when statements are made, they're free, a product of free and voluntary actions; that they're not a product of force, intimidation, threat, promise or any other coercive matter. Without *Miranda* is evidence that the statement is free and voluntary and that safeguards of counsel and so forth have been offered, and I think the statements—I don't know whether it was in the nature of a confession or admission or just a statement, but whatever it is, and I think it does make it a slight difference to a degree, I think it's admissible. So I would rule that there—I don't think that there was an arrest, but even if there was. . . .

Additional facts will be included in our discussion.

## II. DISCUSSION

### A.

Appellant contends that the hearing judge erred in denying his motion to suppress the confession. In support of this position, he claims that he was subjected to custodial interrogation, and did not validly waive his *Miranda* rights, because he did not understand them. Additionally, appellant urges that his confession was involuntary under Maryland nonconstitutional law. In this regard, he relies on the following: (1) he was only ten years old at the time of the events; (2) he suffers from attention deficit syndrome; (3) he was on the medication Ritalin; (4) the duration of the interview was too lengthy for a child with attention deficit disorder; (5) he was threatened by Chief Sines that they would stay at the police station for as long as it took to obtain a confession; (6) he did not understand the *Miranda* warnings; (7) he was ultimately questioned outside the presence of his mother; and (8) he was offered a tee shirt as an inducement to confess.

In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing; we do not consider the record of the trial itself. *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749 (1987); *Aiken v. State,* 101 Md.App.

557, 563, 647 A.2d 1229 (1994), *cert. denied,* 337 Md. 89, 651 A.2d 854 (1995). We extend great deference to the findings of fact and determinations of credibility made by the suppression hearing judge. *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430 (1992); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). Indeed, we accept the facts as found by the hearing judge, unless clearly erroneous. *Riddick,* 319 Md. at 183, 571 A.2d 1239; *Perkins,* 83 Md.App. at 346, 574 A.2d 356. In addition, we review the evidence in the light most favorable to the State. *Riddick,* 319 Md. at 183, 571 A.2d 1239; *Cherry v. State,* 86 Md.App. 234, 237, 586 A.2d 70 (1991). Nevertheless, this Court must make its own independent constitutional determination as to the admissibility of the confession, by examining the law and applying it to the facts of the case. *Riddick,* 319 Md. at 183, 571 A.2d 1239; *see also Ornelas v. United States,* —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

## B.

As we noted, appellant claims that he was subjected to custodial interrogation and that his statement was obtained in violation of his *Miranda* rights. The State vigorously disputes that appellant was in custody during the interview by Chief Sines. Therefore, it posits that *Miranda* is inapplicable.

 It is pellucid that the application of *Miranda* is triggered only in a custodial setting. *Miranda,* 384 U.S. at 441, 444, 86 S.Ct. at 1611, 1612; *see also Thompson v. Keohane,* —— U.S. ——, ——, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995); *Hughes v. State,* 346 Md. 80, 87, 695 A.2d 132 (1997); *Whitfield v. State,* 287 Md. 124, 138–39, 411 A.2d 415, *cert. dismissed,* 446 U.S. 993, 100 S.Ct. 2980, 64 L.Ed.2d 850 (1980). Thus, prior to interrogation, only an individual in *custody* must be advised of his or her constitutional rights. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. An individual in custody may waive his or her constitutional rights, so long as the waiver is made "voluntarily, knowingly and intelligently." *Id.*

at 444, 86 S.Ct. at 1612. "Absent a knowing and voluntary waiver of these rights, any incriminating responses to police questioning are inadmissible. . . ." *Hughes,* 346 Md. at 87, 695 A.2d 132. Therefore, we must first examine the trial court's factual determination that appellant was not under arrest at the time he confessed and its implicit finding that appellant was not subjected to custodial interrogation. We conclude that, under the circumstances of this case, the questioning occurred in a custodial setting, even though appellant had not been formally arrested.

"'Custody' ordinarily contemplates that a suspect will be under arrest, frequently in a jailhouse or station house setting." *Reynolds v. State,* 88 Md.App. 197, 209, 594 A.2d 609 (1991), *aff'd,* 327 Md. 494, 610 A.2d 782 (1992), *cert. denied,* 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993). The concept of "custody," however, is not necessarily synonymous with an actual arrest; it also includes a reasonable perception that one is significantly deprived of freedom of action. *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630.

The Supreme Court explained in *Thompson* that custody may be found when "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." —— U.S. at ——, 116 S.Ct. at 465. Similarly, the Court of Appeals has said that the trial court must consider, *inter alia,* whether the suspect was "physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." *Whitfield,* 287 Md. at 140, 411 A.2d 415 (internal quotation omitted). Further, in *Whitfield,* the Court indicated that whether a suspect "came [to the place of questioning] completely on his own, in response to a police request, or escorted by police officers," *id.* at 141, 411 A.2d 415 (internal quotation omitted), and what occurred at the end of the interrogation, may also be probative in resolving whether a suspect was in custody at the relevant time. The "subjective intent" of a law enforcement officer, however, is not relevant in resolving the custody issue. *Id.* at 140, 411 A.2d 415.

In regard to juveniles, we have added the caveat that "it is reasonable ... for courts to apply a wider definition of custody for *Miranda* purposes." *In re Lucas F.*, 68 Md.App. 97, 103, 510 A.2d 270, *cert. denied*, 307 Md. 433, 514 A.2d 1211 (1986). Indeed, in determining whether a juvenile's statement was made while in custody, the court must consider additional factors, such as the juvenile's education, age, and intelligence. *In re Owen F.*, 70 Md.App. 678, 685 n. 3, 523 A.2d 627, *cert. denied*, 310 Md. 275, 528 A.2d 1286 (1987).

At the chief's request, Joshua was brought to the police department by his mother, after Sines notified Ms. C. of his desire to speak with appellant. No evidence was presented that Joshua wanted to go to the police station to talk to Chief Sines. On this record, we cannot say that the mother's decision to go to the police station constituted the free and considered act of a ten-year-old boy, or that the act of appellant's mother in bringing appellant to the interview was otherwise probative of the custody issue. Therefore, as we proceed to analyze the thorny issue of custody, we give little weight to Ms. C.'s decision to bring appellant to the police department.

We do find it significant, however, that appellant was only ten years old, and he was completely inexperienced in regard to police interviews. It is also noteworthy that the record is devoid of any indication that appellant was ever told that he could leave the office of the police chief at any time during the interview. Nor is there any indication in the record that, once appellant's mother left the room, appellant nonetheless realized he could ask to talk to her in order to obtain her guidance. Instead, appellant was told that the chief would stay as long as necessary. Further, the chief knew that appellant was taking Ritalin for his attention deficit disorder.

When we consider that a ten-year-old boy, with no prior criminal involvement, was alone with the chief of police, at the chief's office, at night, without a parent, and without having been told that he was free to leave, we easily conclude that, for purposes of the interview, appellant reasonably would have

thought his freedom of action was restricted. Therefore, we are amply satisfied that, for *Miranda* purposes, custody was established.

In reaching our conclusion, we find *In re Lucas F.* instructive. There, the appellant was also ten years old and had been picked up by the police as a runaway. He was subsequently interrogated by detectives in regard to a brutal assault committed on a seven-year-old, and was not told that he was free to leave or that his mother was in a nearby waiting room. Moreover, one detective specifically testified that the appellant was in custody. On that record, we concluded that the child "was significantly deprived of his freedom of action and was in custody within the meaning of *Miranda.*" *In re Lucas F.*, 68 Md.App. at 103, 510 A.2d 270. Although there is no indication in the opinion that the child testified in regard to the suppression issue, we added that the boy "reasonably perceived himself to be in the custody of the police." *Id.* The Court went on to hold that "ordinarily a ten year old child is entitled to the counseling and guidance of a parent or guardian before he or she may validly waive the constitutional rights protected by *Miranda.*" *Id.* at 104, 510 A.2d 270.

■ We are equally convinced here that appellant did not execute a valid waiver. As we have said, Chief Sines essentially conceded that, due to his age, appellant probably did not understand his rights. Moreover, the evidence does not reflect that any effort was made—beyond mere recitation of the form—to ensure that appellant (or his mother) really understood the rights or that appellant (or his mother) appreciated the gravity of the circumstances. Nor did the State demonstrate that Joshua "had the mental capacity to comprehend the significance of *Miranda* and the rights waived." *In re Lucas F.*, 68 Md.App. at 104, 510 A.2d 270.

■ We recognize that in *In re Lucas F.*, the Court was troubled that the child was never told that his mother was in an adjoining room; in contrast, appellant was advised of his rights in Ms. C.'s presence. The chief seemed to view Ms. C. as his ally. Given Sines's candid acknowledgment that appel-

lant did not seem to understand his rights, the mere presence of appellant's mother during the advice of rights does not automatically establish a valid waiver. Therefore, while appellant signed the waiver form in the presence of his mother, we decline to impute to appellant his mother's understanding, if any, of his rights.

We hold that the court erred in accepting the waiver. Under the circumstances attendant here, any waiver by appellant was hollow at best. What the Court said in *In re Lucas F.* is apt here:

> The paper writing superficially satisfies *Miranda's* dictates. Facially it appears constitutionally consecrated. But in the case of a child of age ten years, is that enough? Did he realize what services an attorney could perform for him? Did he understand that he was incriminating himself?
>
> \* \* \*
>
> Those questions and others lead us to believe that [appellant's] waiver of *Miranda* was almost, if not totally, meaningless.

68 Md.App. at 103–04, 510 A.2d 270.

### C.

■ Alternatively, appellant argues that even if he were not in custody, the court erred in denying his suppression motion because it was involuntary. He relies on State nonconstitutional grounds. *See Hillard v. State*, 286 Md. 145, 153, 406 A.2d 415 (1979). The State counters, preliminarily, that this issue is not preserved, because defense counsel failed to assert the argument below. *See Brashear v. State*, 90 Md.App. 709, 720, 603 A.2d 901 (concluding that failure to argue particular theory in support of motion to suppress constitutes waiver of that argument on appeal), *cert. denied*, 327 Md. 523, 610 A.2d 796 (1992).

Ordinarily, an appellate court will not decide any issue "*unless* it plainly appears by the record to have been raised in *or decided by the trial court.*" Maryland Rule 8–131(a)(em-

phasis added). The hearing judge found that *Miranda* did not apply because appellant was not in custody and because appellant's confession was *voluntarily* given. The judge stated, in relevant part:

> I think that the atmosphere and the taking of the statement was in fairness and was not the product of a threat, force or promise and was the free act of—
>
> \* \* \*
>
> [B]ut I think it's important to know whether the statement is a product of free will and voluntary exchange or whether it's threatened, induced or intimated [sic]. Certainly, a person young in tender years has a greater advantage than a person who doesn't, but from what I heard from the entire facts presented to me, I think this statement is admissible.

As the hearing judge decided that appellant voluntarily confessed, we are entitled to address appellant's contentions with respect to common law voluntariness. We turn to the merits of the contention.

■ Under Maryland nonconstitutional or common law, the State must establish the voluntariness of a confession, even if a defendant is interrogated in a noncustodial setting. *See Hillard,* 286 Md. at 151, 406 A.2d 415. When a defendant is not in custody, the Court of Appeals has recognized that "*Miranda* did not supersede the existing law on voluntariness." *Hof v. State,* 337 Md. 581, 598, 655 A.2d 370 (1995). *See also Reynolds v. State,* 327 Md. 494, 511–13, 610 A.2d 782 (1992) (applying Maryland nonconstitutional voluntariness analysis when appellant was interviewed in noncustodial setting), *cert. denied,* 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993). Based on "the common law concern for fairness," as well as State and federal constitutional requirements, the Court has reasoned that "a defendant's confession is admissible only if it is '(1) voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3)

elicited in conformance with the mandates of *Miranda.*'"
*Hof,* 337 Md. at 597–98, 655 A.2d 370 (quoting *Hoey v. State,*
311 Md. 473, 480, 536 A.2d 622 (1988) (citations omitted)).

■ Assuming, *arguendo,* that appellant was not in custody
when he was questioned, we are nonetheless of the view that
appellant's confession was involuntary.[4] Based on Maryland
common law, a confession is presumed inadmissible "unless it
is 'shown to be free of any coercive barnacles that may have
attached by improper means to prevent the expression from
being voluntary.'" *Hoey,* 311 Md. at 483, 536 A.2d 622
(quoting *Hillard,* 286 Md. at 150, 406 A.2d 415). *See also Hof,*
337 Md. at 595, 655 A.2d 370; *Lodowski v. State,* 307 Md. 233,
254, 513 A.2d 299 (1986). Further, "a confession is involun-
tary if it is induced by force, undue influence, improper
promises, or threats." *Hoey,* 311 Md. at 483, 536 A.2d 622.
We must also consider whether the accused's "'will was
overborne'" or "'whether his confession was the product of a
rational intellect and a free will'" and whether the accused
"'knew and understood what he was saying.'" *Lodowski,* 307
Md. at 254, 513 A.2d 299 (quoting *State v. Hill,* 2 Md.App. 594,
601–02, 236 A.2d 27 (1967)). In *Hillard,* the Court of Appeals
explained:

---

4. It has never been determined that the voluntariness standards under
Maryland nonconstitutional law and federal and Maryland constitution-
al law are precisely the same. *Hillard,* 286 Md. at 150 n. 1, 406 A.2d
415. We note, however, that the Supreme Court has engaged in a due
process voluntariness analysis even in cases for which *Miranda* did not
apply. *See, e.g., Arizona v. Fulminante,* 499 U.S. 279, 288, 111 S.Ct.
1246, 1253, 113 L.Ed.2d 302 (1991) (holding that prisoner's confession
to fellow inmate working for F.B.I. was coerced and involuntary, but
opinion did not discuss *Miranda*); *Minnesota v. Murphy,* 465 U.S. 420,
430–34, 104 S.Ct. 1136, 1143–46, 79 L.Ed.2d 409 (1984) (holding
interview with probation officer was noncustodial, but statements must
still be voluntary and not compelled); *Davis v. North Carolina,* 384 U.S.
737, 740, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966) ("[T]he nonre-
troactivity of the decision in *Miranda* does not affect the duty of courts
to consider claims that a statement was taken under circumstances
which violate the standards of voluntariness...."); *Johnson v. New
Jersey,* 384 U.S. 719, 730, 86 S.Ct. 1772, 1779, 16 L.Ed.2d 882 (1966)
(concluding that due to nonretroactivity, *Miranda* inapplicable, but
"[p]risoners may invoke a substantive test of voluntariness").

[U]nder Maryland criminal law, independent of any federal constitutional requirement, if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible.

286 Md. at 153, 406 A.2d 415.

In resolving whether a confession is voluntary, the totality of the circumstances standard applies. *Hof,* 337 Md. at 595, 655 A.2d 370; *Reynolds,* 327 Md. at 504, 610 A.2d 782; *Gilliam v. State,* 320 Md. 637, 650, 579 A.2d 744 (1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). The Court of Appeals explained in *Hof* that this standard requires the trial court to consider a variety of factors, including

where the interrogation was conducted, its length, who was present, how it was conducted, its content, whether the defendant was given Miranda warnings, the mental and physical condition of the defendant, the age, background, experience, education, character, and intelligence of the defendant, when the defendant was taken before a court commissioner following arrest, and whether the defendant was physically mistreated, physically intimidated or psychologically pressured.

*Hof,* 337 Md. at 596–97, 655 A.2d 370 (citations omitted). The court must also consider other relevant circumstances, such as whether the defendant's will was overcome due to the use of drugs. *Id.* at 597, 655 A.2d 370.

It is well settled in Maryland that the same totality of circumstances standard applies in juvenile cases in regard to determining the voluntariness of a statement. *McIntyre v. State,* 309 Md. 607, 620–21, 526 A.2d 30 (1987). Thus, "the age of a juvenile, in itself, will not render a confession involuntary," *Jones v. State,* 311 Md. 398, 407, 535 A.2d 471 (1988), but it is a factor for the court to consider. Similarly, although lack of access to a parent does not compel

a finding of involuntariness, *id.* at 407–08, 535 A.2d 471; *McIntyre,* 309 Md. at 620, 526 A.2d 30, it is another important factor in regard to the voluntariness issue. The Court of Appeals has cautioned, however, that "great care must be taken to assure that statements made to the police by juveniles are voluntary before being permitted in evidence." *Jones,* 311 Md. at 407, 535 A.2d 471.

In numerous cases, the Supreme Court has found involuntary the inculpatory statements of juveniles. For example, in *Gallegos v. Colorado,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), the Supreme Court found involuntary the confession of a fourteen-year-old who was held incommunicado by the police and questioned for several days. The Court reasoned that "no matter how sophisticated, [he] is unlikely to have any conception of what will confront him.... [He] is not equal to the police in knowledge and understanding of the consequences of the questions and answers ... and ... is unable to know how to protect his own interests...." *Id.* at 54, 82 S.Ct. at 1212. Similarly, in *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), the Supreme Court held the confession of a fifteen-year-old involuntary, because he was held incommunicado by the police for five days and was coerced, interrogated, and denied access to his parents. The Court recognized that "[a]ge 15 is a tender and difficult age for a boy.... He cannot be judged by the more exacting standards of maturity." *Id.* at 599, 68 S.Ct. at 304. *See also Miller v. State,* 251 Md. 362, 378, 247 A.2d 530 (1968) (holding that sixteen-year-old voluntarily waived *Miranda* rights), *vacated in part on other grounds,* 408 U.S. 934, 92 S.Ct. 2851, 33 L.Ed.2d 747 (1972) (mem.).

In examining the voluntariness issue in this case, we are guided by *McIntyre.* There, the Court considered whether a fifteen-year-old who was arrested for rape voluntarily and knowingly waived his *Miranda* rights and, further, whether his statement was voluntary "in the traditional sense." 309 Md. at 609, 526 A.2d 30. At the time of arrest, the youth understood the advice of rights. When he asked to see his mother, however, he was told that he could not do so, because

he had been charged as an adult. At the police station, the youth was again fully advised of his rights and renewed his request to see his mother; that request was again denied. Subsequently, the appellant executed a written waiver of his *Miranda* rights and, thereafter, he gave the police a statement concerning the alleged crime.

McIntyre argued that his denial of access to his mother violated his rights under the Fifth and Sixth Amendments to the Constitution, because such a request was tantamount to invoking one's right to an attorney. Additionally, he argued that he did not voluntarily waive his rights to remain silent and to the assistance of counsel. The Court of Appeals upheld the trial court's denial of the motion to suppress.

Although the Court recognized "the importance of parental involvement in a juvenile's decision to waive *Miranda* rights, and . . . in evaluating the validity of the juvenile's waiver," *id.* at 620, 526 A.2d 30, it declined "to depart from the totality of the circumstances test in determining the validity of a *Miranda* waiver and in assessing the traditional voluntariness of a juvenile's statement to the police." *Id.* at 621, 526 A.2d 30. After reviewing the entire record, the Court noted, *inter alia,* that there was no indication that McIntyre did not understand his rights. Nor did the Court find the existence of

> any special factors . . . to indicate that he was unable to understand the nature of his actions. Nor . . . was there any indication that McIntyre "was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be . . . [and] he was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit."

*McIntyre,* 309 Md. at 624–625, 526 A.2d 30 (quoting *Fare v. Michael C.,* 442 U.S. 707, 726–27, 99 S.Ct. 2560, 2572–73, 61 L.Ed.2d 197 (1979)). Accordingly, the Court upheld the trial judge's determination that McIntyre voluntarily waived his rights.

In reaching the conclusion that the totality of circumstances test applies to juveniles, the Court relied on *Fare v. Michael*

*C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). There, the Supreme Court held that, during custodial interrogation, the request of a sixteen-year-old, charged with murder, to see his probation officer, with whom he had a special relationship, did not constitute a *per se invocation* of the juvenile's rights to remain silent and to counsel. The Supreme Court reasoned that the totality of the circumstances approach "is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." *Id.* at 725, 99 S.Ct. at 2572. It said:

> The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Id. See also Colorado v. Connelly,* 479 U.S. 157, 169, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986).

■■■ Applying the totality of the circumstances test here, in the light most favorable to the State, it is immediately clear to us that the State failed affirmatively to show that appellant's confession was voluntary. We explain.

Appellant was substantially younger than the youth in *McIntyre.* Moreover, in contrast to the appellant in *McIntyre,* the record does not show that Joshua comprehended his rights. Additionally, no evidence was presented regarding appellant's educational level or intellectual abilities. Chief Sines also testified that appellant's mother left Joshua alone during the interview, at the chief's suggestion. Yet appellant was not informed that he could have further contact with his mother if he wished, or that he was free to leave the interview if he wanted to do so. To the contrary, Chief Sines testified that he told appellant, in effect, that they would remain at the police station for as long as necessary. We also note that there was testimony from Chief Sines that appellant suffered from attention deficit syndrome, for which he took Ritalin.

No evidence was presented as to the nature of this disorder, its effect on appellant, or the ameliorating impact, if any, of the Ritalin. Under these circumstances, we are of the view that the atmosphere was inherently coercive to a ten-year-old.

■ Furthermore, Chief Sines testified that there was some discussion with appellant's mother regarding the use of a tee shirt that the police had on display, as a means of rewarding appellant for telling the truth. He acknowledged that appellant could have been in the room during this discussion. Even if appellant's mother initially raised the possibility of giving appellant the shirt, and then purchased it for him, Chief Sines participated in the discussion and admitted that he may have informed appellant that he could have a shirt if he told the truth. "If a confession 'had been induced by any threat of harm, or promise of worldly advantage held out to [the suspect] by [the interrogating detective], or by his authority, or in his presence and with his sanction, it ought to be excluded.'" *Reynolds,* 327 Md. at 507, 610 A.2d 782 (quoting *Nicholson v. State,* 38 Md. 140, 153 (1873)). A tee shirt is an item that may be perceived by a ten-year-old boy as giving him great "worldly advantage." As the Supreme Court observed in *Haley,* "That which would leave a man cold and unimpressed can overawe and overwhelm a lad...." 332 U.S. at 599, 68 S.Ct. at 304.

In reaching our conclusion, we are mindful of Judge Adkins's comments in his dissent in *McIntyre.*[5] He said: "[C]ourts have long applied special safeguards in cases involving police interrogation of youths charged with criminal activity, and in the use of statements obtained during interrogation." *McIntyre,* 309 Md. at 626, 526 A.2d 30 (Adkins, J.,

---

**5.** Based on questions implicating both constitutional and policy considerations, Judge Adkins disagreed with the majority's determination in *McIntyre* to apply the totality of circumstances approach in analyzing voluntariness. Instead, he advocated use of the "interested adult rule," which requires a parent or other adult to be informed of the child's rights, to have an opportunity to be present during interrogation, and to consult privately with the child. *McIntyre,* 309 Md. at 626–34, 526 A.2d 30 (Adkins, J., dissenting).

dissenting). Moreover, he noted that the majority did not disagree with his assertion that "[s]tatements obtained from juveniles during police interrogations invite special caution and should be carefully scrutinized, not simply for evidence of physical or psychological coercion, but for some demonstration that the juvenile comprehended his constitutional rights." *Id.* at 629–30, 526 A.2d 30.

Such a demonstration is woefully lacking here. Even if appellant were not in custody, thereby relieving the State of its obligation to inform Joshua of his rights, we cannot ignore that the State elected to advise appellant. Due to his age and other factors, appellant apparently did not understand his rights or appreciate the gravity of his circumstances. If appellant did not understand those rights, we cannot look the other way by sanctioning the use of appellant's statement at trial.

We recognize that, in recent years, there has been a heightened public concern for the increasing numbers of crimes of violence committed by teenaged juvenile offenders. Nevertheless, neither the Court of Appeals nor the Legislature has abrogated the "strong public policy commitment to juvenile welfare." *McIntyre*, 309 Md. at 629, 526 A.2d 30 (Adkins, J., dissenting). This policy warrants application of special safeguards here. Appellant's failure to appreciate his rights, coupled with the general caution we apply to inculpatory statements made by children, inescapably leads to our conclusion that Joshua's statement was not voluntary.

At trial, Eric S. testified that he, appellant, and others stole the lighters and caused the burning to the building. Appellant's mother testified that the boys were at her house playing video games on the date in question. In light of this conflicting evidence, we are unable to conclude that the admission of appellant's confession was harmless beyond a reasonable doubt. *See Arizona v. Fulminante*, 499 U.S. 279, 295, 111 S.Ct. 1246, 1257 (1991) (concluding that harmless error analysis applies when coerced confessions admitted at trial).

Accordingly, we reverse and remand appellant's case to the Circuit Court for Garrett County for further proceedings.

**JUDGMENTS REVERSED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR GARRETT COUNTY FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID BY GARRETT COUNTY.**